Lindsley v. McGrath.

THOMAS E. LINDSLEY, JAMES D. LINDSLEY and MARY TEMPLE

*v.*

THOMAS B. McGRATH.

[Submitted April 12th, 1901. Decided October 19th, 1901.
Filed December 21st, 1901.]

1. Where, in a suit to quiet title, defendants fail to show any deed to the premises, but show a contract for the purchase of the land by them, and that the holder of the title accepted from them payment of the consideration money, it is evidence of an equitable title in them.

2. Where, in a suit to quiet title, defendants fail to show any deed to the premises, but it appears that the owner of the premises accepted from defendants payment in cash and by a bond and mortgage on the premises, the owner's representatives are estopped from setting up a legal title as against the defendants' equitable one.

3. Where the issue was whether land occupied by husband and wife was that of the husband or of the wife, the wife being deceased, it was proper to admit evidence of declarations made by her to show that she claimed the title to the land.

4. In a suit to quiet title, the issue was whether a certain deed from the one under whom both defendants and the plaintiffs claimed was made to one whom complainants claimed as their grantor, or to the one whom defendants claimed as their grantor.—*Held*, that the evidence was insufficient to sustain complainants' contention.

5. The will of one who owned certain notes secured by a mortgage on land bequeathed a certain sum to each of the children of the mortgagor. The will provided that, if the indebtedness from the mortgagor should not be paid, the same might be set off against the legacies to the children, and this was done. The mortgagor had a claim which was allowed by the testator's executor and set off against the amount due on the notes. —*Held*, that the children were entitled to be subrogated, to the extent of their legacies, to the rights of the testator as mortgagee of the premises, so as to clothe them with an equity prior to that of one who was the equitable owner.

Heard on bill, answer, cross-bill and replication to cross-bill.

*Mr. James H. Neighbour*, for the complainants.

*Mr. Ford D. Smith*, for the defendant.

PITNEY, V. C.

The complainants, Thomas E. Lindsley, James D. Lindsley and Mary Temple, are brothers and sister, and file their bill to quiet title to a tract of about fifty acres of land situate in the township of Jefferson, Morris county, which they allege to be in the possession of their tenant.

The defendant files his answer and cross-bill, in which he avers that he was, at one time and until recently, in possession through a tenant, but that recently the complainants had induced the tenant to attorn to them, so that the complainants are in possession.

Both parties claim through one Jacob L. Fichter, or, as he was sometimes called and sometimes signed his name, Jacob Fichter, who lived and did business in the village of Rockaway, Morris county, about ten miles from and south of the premises.

The complainants, by their bill, deduce their title as follows: A deed of conveyance from Jacob L. Fichter and wife to Sarah L. Lindsley, dated February 8th, 1858; the death of Sarah L. Lindsley seized of the premises and intestate, in December, 1866, leaving her husband, Stephen A. Lindsley, surviving, and the three complainants and four other brothers and sisters her heirs-at-law; and the death of four of the heirs of Sarah L. Lindsley intestate and without children, by which their title by descent was cast upon the three complainants as their heirs-at-law.

The defendant sets out his title as follows: A contract of sale, entered into between Jacob L. Fichter and Stephen A. Lindsley on December 6th, 1852, to convey the premises in question to Stephen, for the consideration of $900, of which $200 in cash was then paid, $200 further was to be paid on May 27th, 1853, and the balance to be paid by a mortgage of $500; that the second sum of $200 was paid on or about May 27th, 1853, and that, on the day last named, Fichter and wife conveyed the premises to Lindsley by a good and sufficient deed of conveyance, and that Lindsley and wife executed and delivered to Fichter a mortgage, dated that day, to secure the balance of the consideration money—$500—in sums of $100 a year for five years, as witnessed by five promissory notes for that amount made by Lindsley to Fichter; that that deed was never recorded, and is lost; that

afterwards Lindsley paid the whole or some part of the money secured by said mortgage; that the making of said deed of conveyance from Fichter to Stephen A. Lindsley was well known to his wife Sarah L. Lindsley, and that she took a deed of conveyance, on February 8th, 1858, from Fichter, without consideration paid, and with full knowledge of the prior conveyance to her husband, and without her husband's consent; that after the death of Sarah L. Lindsley her husband married one Mary Vermeule; that he and his second wife remained in possession of the premises until 1897, when he died, having left a last will and testament, in which he gave the whole of his property to his widow, Mary Lindsley; that the estate of Stephen A. Lindsley became indebted to the defendant, McGrath, who was an undertaker, for the expenses of the funeral of the said Stephen A. Lindsley, and that the widow made a deed of conveyance to him (McGrath) to secure him for such indebtedness.

The complainants' answer to the defendant's cross-bill sets up and claims that the lost and unrecorded deed of conveyance, alleged by the defendant to have been made on May 27th, 1853, by Fichter to Stephen A. Lindsley, was, in fact, made to the said Sarah L. Lindsley.

Upon these pleadings the cause was brought to a hearing upon evidence, and the following facts appeared:

That Lindsley was a carpenter and builder, who lived with his wife on the premises in question at and before December 6th, 1852, and that she bore him the children mentioned in the pleadings, and that four of them died intestate, as stated in the bill; and that the defendant acquired his title under the will of Stephen Lindsley and the deed of Stephen Lindsley's second wife, an aged lady, who still survives, and has one son by her husband, Stephen Lindsley.

It appeared that Sarah L. Lindsley, the first wife of Stephen A. Lindsley, was a sister of the wife of Jacob L. Fichter, from whom both parties claimed, and that the two were the daughters of David Estill, an old gentleman of some means, who lived near the premises in question.

Lindsley's family lived, as we have seen, on the premises in

Lindsley *v.* McGrath.

question, and Jacob L. Fichter, the grantor, was a merchant and lived with his wife in Rockaway, ten miles south from the premises. Lindsley did not live happily with his first wife, and his trade carried him away from home a good deal of the time, and sometimes for a month or a year. The premises were then, and still are, of little value.

The defendant produced a receipt, admitted to be in the handwriting of Fichter, dated December 6th, 1852, in the following words:

"Received December 6th, 1852, from Stephen A. Lindsley, two hundred dollars, being one payment on my farm, price stated in deed.
"$200.                                         JACOB FICHTER."

Further, he produced another receipt, also admitted to be in the handwriting of Jacob L. Fichter, as follows:

"Received May 27th, 1853, from Stephen A. Lindsley, two hundred dollars, being 2d payment on my farm, price stated in deed.
                                         "JACOB FICHTER."

He then produced a canceled mortgage, covering the land in question, made by Stephen A. Lindsley and Sarah L. Lindsley, his wife, to Jacob Fichter, dated May 27th, 1853, in the handwriting of and acknowledged before Horace Chamberlain, a commissioner of deeds, who has been dead several years. It is witnessed, however, by Stephen Strait, also deceased, a well-known citizen of Jefferson township. Mr. Chamberlain is known to the court (and the knowledge of the court was taken by the parties at the hearing instead of proof) to have been a surveyor and conveyancer of considerable repute for care and accuracy, who lived in the neighborhood of these lands.

The consideration named in the mortgage was $500, and it was conditioned to pay

"$500, according to five promissory notes for the sum of $100 each payable to Jacob Fichter or bearer, in one, two, three, four and five years from date, with interest from date, and bearing date on the 27th of May, 1853."

31

The description of the property, which is in two tracts, is not by metes and bounds, but by reference to adjoining owners, and to the record of a deed to Edward Condict, who was Fichter's grantor, but not to the conveyance to Fichter; and the mortgage itself does not refer to any cotemporaneous or other conveyance made by Fichter to Lindsley; and the only legal proof offered by defendant of the making of a deed at that time is what is contained in the two receipts for $200—each in the handwriting not of Mr. Chamberlain, but of Mr. Fichter himself, and which says that the payments are made "on my farm, price stated in deed," and the execution and delivery of the mortgage.

The defendant also produces the five promissory notes referred to in the mortgage in question, which appear to have been all written on one sheet of paper, in the handwriting of Mr. Chamberlain, and signed by Stephen A. Lindsley.

The production of those notes would be *prima facie* proof that they were paid by Lindsley, but there is other evidence in the case, presently to be referred to, which indicates that only two of them were so paid.

It is further proven or admitted in the case that Jacob L. Fichter became pecuniarily embarrassed in the year 1858, at or shortly before the time of the making of the deed (under which the complainants first relied in their bill) by him, Fichter, to Mrs. Lindsley; that he shortly afterwards made an assignment for the benefit of his creditors, and that the deed of 1858 was made to prevent complications which might arise from the title appearing to be in him and included within his assignment. That deed, the record of which is produced, is one of bargain, sale and quit-claim, and with no covenants, except against the grantor; and no proof was offered, nor does anything appear in the case from which it can be inferred that any consideration whatever was paid for it.

So far, the case shows no passing of the legal title from Jacob L. Fichter to Stephen A. Lindsley, but it does, in my judgment, in the absence of any conveyance, show that the equitable title passed to him. The holder of the title accepted from him payment of the consideration money, partly in cash and partly by a bond and mortgage on the very premises; that conduct on

the part of Fichter seems to me to estop him and his representatives from setting up his legal title as against Stephen A. Lindsley's equitable title.

But the complainants, to meet this case and by way of abandonment of that part of their bill which claims under the deed of 1858, assert in their answer to the defendant's cross-bill that the deed made in 1853, or about that time, was actually made and delivered to Sarah L. Lindsley, and not to her husband; and in support of that position they offer in evidence a memorandum book, proven clearly to have been kept by Horace Chamberlain, and in his handwriting, purporting to be a memorandum of the various deeds, mortgages and other instruments acknowledged by him while holding the office of commissioner of deeds, kept in tabular form.

The admission of this book was objected to and resisted by the defendant, and, upon consideration, I am unable to find any safe ground for receiving it. It is not a record kept in pursuance of any official duty, or of any practice adopted by such officers, but merely for his private use individually. The cases on this subject are collected by Dr. Wharton in his book on *Evidence,* sections 226-251, inclusive. Among them I can find none that quite reaches the present case. The book is, in effect, merely a diary. However, I shall consider the cause as if it was competent evidence for what it is worth.

The entry in that book relied upon by the complainants is as follows: "1853 May 27 Fichter Jacob & wife Sarah L. Lindsley Q Decem 7 900.00," and over "7" is written "1852," and under "Decem 7" appear the figures "1853." The words "1853 May 27" are under the words "Date of acknowledgment;" the words "Fichter Jacob & wife" are written under the word "Grantors;" the words "Sarah L. Lindsley" are written under the word "Grantees," and the letter "Q" stands for quit-claim. The figures "1852 Dec. 7 1853" are under the heading of "Date of," and the "900.00" under the word "Consider." This indicates that the conveyance was dated December 7th, 1852, and was a quit-claim.

Now the record of the deed under which the complainants claim in their bill is entered in this book in this wise: "1858

Feby 8 Fichter Mary A. ·Sarah Lindsley Q 1858 Feby 8 900.00."
That is clearly erroneous, because the deed was made by Jacob
L. Fitcher and his wife, Mary A. How it happened that Mr.
Chamberlain made such an entry is not easily explained. It
was not accidental.

The mortgage which has been offered in evidence is correctly
entered on his book.

Admitting, however, that the deed was so prepared and exe-
cuted by Jacob L. Fitcher, there is no proof that Stephen A.
Lindsley was present at the time the deed was executed, or that
he knew of its contents, or that he ever accepted it as an execu-
tion of his contract made on December 6th, 1852; and this is
accentuated by the fact that if it ever came to his possession he
refused to permit it to be recorded, and undoubtedly destroyed it.

But the complainants further rely upon the evidence of a Miss
Maines. She was called to testify to a conversation which she
had with the first Mrs. Stephen A. Lindsley a short time before
she died. The evidence of the declarations of the first Mrs.
Lindsley was competent only to this extent: the complainants
of course relied, in order to rebut the effect of the long possession
and occupation by Stephen A. Lindsley after the death of his
first wife, upon the circumstance that he was in possession as
tenant by the curtesy, and that such possession was not adverse
to the title by remainder in his children by his first wife; and
the defendant, in order to fortify his case in that respect, proved
declarations by Stephen A. Lindsley while in possession that he
claimed to be the owner of the premises absolutely, and not as
a mere life tenant.

Now, the evidence of declarations made by Mrs. Lindsley were
admissible to show that she claimed to be the owner, in her own
right, in her husband's lifetime. At least, they were so admitted
by me, and were not objected to by the defendant. I will, how-
ever, consider them as if competent evidence.

The substance of Miss Maines' evidence was that Mrs. Lind-
sley, a short time before she died, declared to her that there was
actually a deed from Fichter and wife, made and executed in
1853, and that it was made to her and not to her husband, but
that her husband was mad because it was so made, and never

would permit it to be put on record; that at one time when he was leaving home for an extended period he took the deed and promised to stop in Morristown and have it recorded, but never did, and that she afterwards procured the later deed from her brother-in-law, Jacob L. Fichter; that Fichter came to her and asked if the deed had been recorded, and proposed to make a new one.

Taking the statements of Mrs. Lindsley to be competent evidence of the facts stated, it still appears that Stephen A. Lindsley never did consent that the title should go to his wife—refused to the last to acquiesce in that arrangement—and hence never meant to make a gift of the property to her.

Against that position stands the fact, according to the memoranda in Mr. Chamberlain's book, that on the same day that the lost or destroyed deed from Fichter to Mrs. Lindsley was executed, Lindsley and his wife appeared before Chamberlain and acknowledged the mortgage upon which the defendant relies; and there is no doubt that the two papers constituted one transaction, and that the ordinary inference would be that they were exchanged at one time, and that Lindsley knew that his wife's name, and not his own, was inserted as grantee in the deed, and that the execution of the mortgage in that shape and the acceptance of the deed were a ratification by him of the conveyance to his wife.

But all the circumstances must be taken together. It is common knowledge that such transactions are often carried through on the same day without the parties actually meeting. The execution of several papers may occur at different hours of the same day; and that may have happened in this case, and there are circumstances which indicate that it did happen.

In the first place, if Fichter and his wife and Lindsley and his wife both appeared at the same time before Chamberlain, why was any receipt given and signed by Fichter for the payment of $200 on that day? And why was it in the handwriting of Fichter, while the notes and mortgage were in the handwriting of Chamberlain? Then, again, the language of the two receipts is precisely the same—the first one being, "One payment on my farm, price stated in deed;" and the other being,

"Second payment on my farm, price stated in deed." . Now, the receipt for the first payment is dated December 6th, and as it is in Fichter's handwriting, there is every reason to believe that it was made at his store in Rockaway, and it is plain that the receipt was all written at one time. But the memorandum in Chamberlain's book shows that the deed was dated December 7th, so that the deed was not prepared at the time that first receipt was signed, and there is, therefore, no reason to suppose that Mr. Lindsley saw it at that time. The presumption is that Fichter had it prepared after the payment on December 6th. And when we come to the second receipt we find it to be in precisely the same language, and referring to the deed in the same way; and, as before remarked, I can see no occasion for the giving of that receipt if it was precisely cotemporaneous with the execution of the deed. And, in turn, I am unable to infer against Mr. Lindsley that he saw and examined the deed at the time of paying the second $200.

A more probable theory of the transactions of that day is this: That Mr. Lindsley, having accumulated the $200, and being ready to close the transaction, procured Chamberlain, who lived near him, a day or two before the 27th of May, to prepare the mortgage, and he and his wife went to Chamberlain in the morning of that day and acknowledged it, then he himself went to Rockaway, paid the money to Mr. Fichter, took his receipt, informed him that the mortgage was executed, and requested him to make the deed; that he then took the railway train to go to his work, wherever it may have been; that Fichter went immediately; with his wife, to Chamberlain's house and acknowledged the deed already prepared.

There is no proof that Chamberlain prepared this lost deed, but the indications are the contrary. If he had done so and had it in his possession at the time the mortgage was executed, I see no reason why a careful conveyancer like him would have omitted reference in the mortgage to that deed, instead of referring, as he did, to an old deed. Besides, it is plain that he did not have before him the deed under which Fichter claimed when he prepared the mortgage. That deed was made by Edward Condict and wife to Fichter on April 13th, 1840, and described

the property not by metes and bounds, but by adjoining owners, and declares that it is the same premises conveyed to Condict by Benjamin and John Chamberlain by deed dated January 18th, 1840, with a reference to the record.

Now the mortgage contains precisely the same description as that contained in the deed from Condict to Fichter, and, as before remarked, does not mention that conveyance.

All these circumstances—the date of the deed from Fichter to Lindsley, as shown on Chamberlain's book; the giving of the second receipt for $200, on the 27th of May; the peculiarity of the description in the mortgage from Lindsley to Fichter, showing that it was probably prepared and executed before Chamberlain saw the deed, and the fact that when Lindsley discovered that the deed was made to his wife and not to him he refused to record it and destroyed it—tend to show that it was so made without his knowledge and consent, and that he never acquiesced in it. As Fichter's wife was the sister of Mrs. Lindsley it is easy to perceive that Fichter would assist in having the title so placed.

It may be asked, why did Lindsley, after he learned that the deed was made to his wife, acquiesce in it for so long a time? The answer is this: The evidence tends to show that Lindsley and his wife had been in the possession of the premises for some time before the mortgage and deed, if any, were made, and that Fichter was a mere mortgagee for the sum of $900. Fichter had already received $400 on account of the principal, and was demanding and receiving money on account of the mortgage. Finding, as I have, that Fichter had caused the deed to be made to Lindsley's wife, and that he was favorable to her, and would do nothing except by compulsion at the end of an expensive lawsuit, and that he, Lindsley, was in possession, he may well have rested in that situation. There is no proof that he knew, for a long time at least, that Fichter had made the deed of 1858 to his wife. Then after his wife's death he married again and was in possession and continued so for a great many years. He was probably ignorant of the law that it was possible to nullify the effect of his possession by showing that he was in as tenant

by the curtesy, and so he rested believing himself to be the owner of the premises by a sufficient title.

And it must be observed here that the complainants, his children, were mere volunteers. They have paid nothing on the strength of their mother's title.

Taking, then, the whole case together, it seems to me that the defendant clearly holds the title in equity (subject to an equity in the complainants which the defendant freely admits, and which will be hereafter referred to), and that in the absence of any competent proof that the deed of 1853 was actually made to the wife, or, if made to her, that it was so done by the direction and consent of the husband, or that he afterwards acquiesced in or affirmed the title in her, I think the decree must be for the defendant. Of course, the deed of 1858 cannot change the *status* if, as I find to be the fact, it was made without the husband's consent and direction.

The special circumstance to which I refer is this: After Stephen A. Lindsley had paid two of the promissory notes to Fichter, the three remaining notes were, with the mortgage, assigned by Fichter to a man named Allen, and by him were assigned to David Estill, the father of the first Mrs. Lindsley, and held by him when he died in 1876. His executor inventoried the mortgage as $300 of principal and $300 of interest.

Estill, by his will, provided as follows:

"I give and bequeath to the children of my daughter Sarah L. Lindsley, the deceased wife of Stephen A. Lindsley, the sum of $200 each, to be paid to them severally as they respectively attain the age of twenty-one years, with the accumulated interest; and which said interest my said executors are required to make by safe investments as rapidly as practicable; and in case any of said children shall die under the age of twenty-one years, then the share or part of such deceased child's share to be equally divided among the heirs of such deceased child."

A further provision in his will was that if the indebtedness due him from Stephen A. Lindsley on the bond and mortgage in question was not paid, the same might be set off against the legacies given to his children; and this was done.

The proofs show that some of the children of Stephen A. Lindsley died before and some after their grandfather Estill

died, and that some died after he died and before their father died, all intestate and without heirs, so that the shares of those which died between the death of David Estill and the death of Stephen Lindsley became vested in equity in their father, Stephen A. Lindsley, as their next of kin. The father, Stephen A. Lindsley, at the time of Estill's death, had a claim which was proven and allowed by Estill's executor, which was offset against the amount due on the notes secured by mortgage; so that the complainants are entitled to be subrogated, to a certain extent, to the rights of David Estill, as mortgagee of these premises, and to a lien on them, to the amount to be ascertained by a careful computation. Such computation can be made by counsel, and, when determined, a decree will be advised in accordance with these views.

The effect of the decree will be that the lien of the complainants will be paramount to that of the defendant for his bill for burying their father, and that the second Mrs. Lindsley will get what is left, which, according to the statements of counsel, will not reach a large sum.